## FRANCES MORGAN

*v.*

## JOHN M. CLAYTON.

1. TRUST—*what constitutes.* When property is sold by agreement of several interested parties to one of their number, to be held in trust for protection of their interests, their intention may be shown by parol or memorandum in writing.

2. SAME—*to be fulfilled strictly.* A trust must be executed within its terms. An unauthorized sale by the trustee will be set aside at the instance of any injured party.

3. NOTICE—*purchase for value.* A purchase at an unauthorized and voidable sale must be *bona fide*, for a valuable consideration, without notice of existing equities, or collusion, or it will be set aside.

4. SAME—*collusion—irregularity.* Where the purchaser is of kin to the wrongful seller; takes title without the usual preliminary negotiation as to price and terms of sale; when payments are nominal and not provided for in the usual manner, and the vendor is left in control of the property—there is strong presumption of collusion and fraud.

5. QUIT-CLAIM DEED—*how far effective.* A quit-claim deed will as effectually pass the title and covenants running with the land as a deed of bargain and sale, if no words restrict its meaning.

6. SAME. He who, accepting a quit-claim deed, knowing of a former incumbrance, does not cancel that incumbrance on paying it off, but takes an assignment of it to himself, furnishes the presumption that he considers himself holding as a creditor rather than a *bona fide* purchaser, and keeps the way open for a redemption by the original mortgagor.

7. VALUE OF IMPROVEMENTS UNDER DEFECTIVE TITLE. The holder under a defective title, though with notice, may be held a mortgagee in possession, and be entitled to repayment of advances made in good faith and expended in improvements.

APPEAL from the Circuit Court of Cook county; the Hon. ERASTUS S. WILLIAMS, Judge, presiding.

Messrs. BECKWITH, AYER & KALES, for the appellant.

Messrs. DENT & BLACK, for the appellee.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

The appellee having purchased of Horatio N. Heald the equity of redemption in the property in controversy, filed his bill to redeem the lands from a mortgage executed to George W. Lay, Sen., on the 1st day of December, 1856, to secure a loan of $10,000 for a period of ten years, with semi-annual interest at the rate of ten per centum per annum. For the principal and the several interest installments secured by the mortgage, notes had been taken, payable in gold or silver, and it was provided that, for any default, the principal should be treated as due.

In 1858 the property was further incumbered by Heald with a deed of trust containing a power of sale to Andrew Aiken to secure certain indebtedness to Amos G. Throop. The interest of Throop in that deed of trust had been assigned to Gibbon M. Taylor as collateral security, and the deed itself placed in the hands of his resident attorney, H. F. Mather, who had charge of his interests. The indebtedness, however,

secured by the Aiken deed of trust, has been in some way adjusted, and it is not now involved in this controversy.

It appears that Heald failed to pay the interest on the Lay mortgage, falling due on the 1st day of December, 1859, and never afterwards paid anything thereon; and that, prior to 1861, he had made default in the payment of the indebtedness secured by the Aiken deed of trust.

George W. Lay, Sen., to whom the mortgage was executed, resided in the State of New York, but the loan was effected through the agency of his son, George W. Lay, Jr., then a resident of Chicago.

In the spring of 1861, George W. Lay, Jr., still having charge of his father's interest in the mortgage, proposed to Heald and the parties interested at that time in the Aiken deed of trust, to have the premises sold under the power contained in that deed and bid off in his name, so that the property which had hitherto been vacant and unoccupied could be improved and made to produce an income. An arrangement, thought to be profitable to all, was perfected, and accordingly on the 10th day of May, 1861, the property was sold by Aiken, the trustee named in the deed, by virtue of the authority vested in him, and was bid off in the name of George W. Lay, Jr., for the nominal sum of $20, subject, as stated in the deed made by the trustee, to the debt secured by the Lay mortgage.

In April, 1863, George W. Lay, Jr., by a quit-claim deed, conveyed the property in controversy to the appellant, and it is that title that he now seeks to interpose as a defense to the relief asked for in the bill.

The circuit court decreed relief and caused an account to be taken of the amount necessary to redeem the property, with which both parties seem to be satisfied; at least no objection is made in this court to the sum found to be due to the appellant, which must be paid to him in case a redemption is permitted.

The appellant makes two points on which he mainly relies for a reversal of the decree :

*First*—That he was a *bona fide* purchaser, for value, without notice, and as such, acquired the legal title to the property.

*Second*—That the alleged trust in George W. Lay, Jr., was substantially executed according to its terms, and the appellee and his grantor, after knowing of the sale and conveyance to appellant, delayed for an unreasonable time to make objection if they had any.

We will consider these objections in the reverse order from that in which they are stated.

It is conceded that Lay, Jr., purchased the property at the trustee's sale under some agreement made with and for the benefit of those interested as mortgagor and mortgagees, but the parties differ as to the exact terms of the trust and as to the construction that shall be given to the contract under which the property was bid off.

It is insisted by the appellant that the extent of Lay's undertaking was, and that such was the agreement between him and Heald, Throop and Taylor, that he would hold the land until it had advanced sufficiently, together with the rents to be derived therefrom, to pay the debt secured by the first mortgage and also the further advances of money necessary to erect the building on the premises, and that whenever the property would bring an amount sufficient to liquidate these demands he could properly sell in the due execution of the trust, and the treaty with appellant, in substance, covered his whole obligation and duty in the premises.

This was not all his duty, nor even a substantial compliance with the terms of the trust reposed in him. We think that the agreement between the parties was broader and more comprehensive than that stated by the counsel. It seems to us that the memoranda made by Freer and Mather, the attorneys who conducted the business, would furnish the most accurate understanding of the contract under which Lay bid off the property. If the memoranda made at the date of the

transaction shall be regarded as containing a true statement of the agreement, there can be no doubt that he was to hold the property not only to secure the debt due to his father, on the mortgage, and the advances necessary to erect the buildings, but also for the benefit of the holders of the Aiken deed of trust, and Heald himself.

Great reliance is placed by counsel on the testimony of Throop, as stating accurately and clearly the terms and the extent of the trust.

We do not think that the evidence of Throop, when construed together as a whole, is at all inconsistent with the testimony of the witnesses Freer and Mather, aided by the memoranda, or that he states the terms of the trust differently from what they do. According to their evidence, Lay was to be the trustee of all the parties, and so we understand Throop to state the agreement, in substance. There is, in fact, no contradiction, and if there is any difference it is only that he does not state the terms and conditions of the trust quite so broadly.

In this view of the evidence, Lay had not complied with the terms of the trust when he conveyed the property to the appellant. The facts in the case clearly rebut the theory that any power of sale was vested in him, and that he could exercise it at any time whenever he deemed the terms of the trust fulfilled. The trust had not then been accomplished, and the conveyance was, itself, a plain and palpable violation of his obligations in regard to it so far as he was concerned.

It makes no difference that the indebtedness secured by the Aiken deed of trust has since been extinguished. He was still the trustee for Heald, and he had no lawful right to convey the estate without his consent. It was as much for Heald's benefit as for the benefit of the mortgagees that the property was placed in Lay's hands to be by him improved so as to render it productive. He voluntarily assumed the obligations of the trust, and it was his duty to have discharged them faithfully towards all concerned. In no aspect of the case does it appear that the trust had been executed according to any fair

and just construction of its terms when the conveyance was made to the appellant.

The most important question, therefore, that can arise in the case is, whether the appellant was a *bona fide* purchaser for value, without notice, and as such acquired the legal title to the property.

It is no objection that the conveyance in this instance was by quit-claim deed. A deed of that character will as effectually pass the title, and covenants running with the land, as a deed of bargain and sale, if the deed itself contains no words restricting its meaning. *Butterfield* v. *Smith,* 11 Ill. 485 ; *Brady* v. *Spurck,* 27 Ill. 478.

We do not deem it necessary to consider the question argued by counsel, to what extent a purchaser in good faith, who has only paid a part of the purchase money before notice of prior equities, and who subsequently completes his payments, will be protected ; or whether Heald or his grantee, or the holders of the indebtedness secured by the Aiken deed of trust in this instance, could have had any interest in the fund remaining due after notice, instead of the land itself. These questions could only become material in case we should construe the arrangement between Lay, Jr., and the appellant, as an absolute bargain and sale, such as would invest appellant with the equitable title to the estate.

We do not think that the transaction will bear the construction sought to be given to it by the counsel for the appellant. Under the most favorable view that can be taken, if the testimony of the appellant shall be regarded as giving a true and accurate statement of the contract between Lay and himself—and there is very little in the record that militates against it—the bargain would not amount to an absolute purchase of the estate, nor would it be sufficient even to give him the equitable title prior to the making of the deed in 1863.

It is difficult to realize that Lay, Jr., deliberately planned to perpetrate a fraud upon the parties with whom he was dealing while professing to be doing them a friendly act. If the

construction insisted upon is the true one, then we find him, at the very time that he was negotiating with the parties to have the property sold to him for a nominal sum so that it could be improved for their mutual benefit, bargaining with the appellant to make an absolute sale of it to him. We prefer to give a more innocent construction to the conduct of Lay, and one more consistent with upright and fair dealing. The evidence fully warrants us in doing so.

It appears that Lay approached the appellant on the subject, as he says, of buying the property, in the month of February prior to the sale under the Aiken deed of trust, in May, 1861. The only thing that was said about the price at that time was, that the appellant asked him what the property was worth, to which Lay replied, about $250 per foot; but the appellant declined to purchase, mainly, as he says, for want of means. Nothing more occurred between the parties until the 21st day of April, 1861, just as the appellant was leaving Chicago for Cairo to enter the military service of the United States.

It will be remembered that Lay is a brother-in-law of the appellant, having married his sister. The appellant was then a young man about twenty-three years of age, and was about to enter the military service. He says that a moment before he was to start with his company, Lay urged him to accept his proposition in regard to this piece of property, and agreed to attend to the erection of a building for him. In answer to a question as to what he said in regard to the proposal, he replied, "Nothing more than to give him an installment accepting it, and I gave him an installment to commence building, and left." This is the substance of the contract between Lay and the appellant, as given by himself. The testimony of Lay was not taken by either party, although he was made a party to the suit, and served in New York with a copy of the bill under the provisions of our statute.

It will be observed that there was no price agreed upon that the appellant should pay for the property, or any time or

terms of payment. The appellant says that he was in a great hurry and but little passed between them. At that time he gave Lay a draft on London for £250, which amounted in our currency to $1177.66, with which to commence the building. It is not pretended that any portion of this installment was to apply as a payment on the property itself.

The appellant remained in the army until July, 1862, but in the meantime made sundry payments to Lay, which were used by him in the erection of the building. The buildings were completed under the direction of Lay, and by him placed under rent. In the beginning he counseled with Heald and Throop as to the character of the buildings and cost of the same, that should be erected, and also in regard to procuring suitable tenants after the completion of the buildings.

On the 14th day of April, 1863, Lay executed and delivered to the appellant the quit-claim deed. At that date it is conceded that the appellant had been notified of the existence of the mortgage to Lay, Sen., and that it was a lien upon the premises, and the deed is made expressly subject to the payment, by the appellant, of the debt secured by that mortgage. On the 16th day of the same month, the appellant says that he had a general settlement with Lay and they closed up the *bargain* to that date. Lay was then about to change his residence to New York, which he did do shortly afterwards.

At this settlement it was found that the appellant had paid in money and rents received by Lay, Jr., the sum of $10,322.26. Of that amount $6,658.63 was paid for the erection of the buildings, and perhaps the general care of the property, and the balance was applied, as he says, to the purchase of the property. The appellant states the manner of making the payments for the property and how it was done. He says that at the settlement he had with Lay he found that he had a mortgage on the property belonging to his father, of Batavia, New York, for $10,000; that there had been some back interest that had not been paid on the mortgage, which he took up as part payment, and assumed the $10,000, with interest at

the rate of ten per centum per annum for the rest of the payments on the property, making the entire amount paid something over $20,000.

The appellant paid the interest notes as they severally became due, and also paid the last note, or principal, of $10,500, before the same, in fact, became due. Instead of having the notes cancelled, the appellant had them assigned to him, but without recourse. When the last note was paid, the mortgage was regularly assigned to him by the heirs of George W. Lay, Sen., all of which he now holds.

Thus it will be seen that the appellant paid nothing to Lay, Jr., for the title which he claims to have purchased from him. The payments were made exclusively for the expenditures in the erection of the buildings and in discharge of the lien created by the Lay mortgage, the evidences of which he caused to be assigned to himself, and which he still has in his possession.

Was this an actual sale and transfer of the property? If so, it lacks the elements usually found in such transactions. What was the agreed price, time and manner of payments? These are matters about which parties, in making a sale, ordinarily contract. If it was a *bona fide* sale, and intended to be such, what were the terms of the contract as originally made? It was certainly not that the appellant should advance the money with which to erect the buildings and to discharge the indebtedness secured by the Lay mortgage, for he states explicitly that he did not know of the existence of that mortgage at that time, nor for several years afterwards. It was not at the rate of $250 per foot, for it is not pretended that he paid for the property in that way.

It is said that the appellant did not have actual notice of the existence of prior equities until in the year 1864, and that previous to that time he had expended a large sum of money in the erection of buildings on the property in the belief that he had purchased the title.

We do not think that the evidence will bear this construction. At the date the appellant made the first payment in the draft on London, Lay had not then obtained a title under the trustee's sale. The arrangement, however, had been made that he should have it. It is immaterial whether Lay was his agent to buy the property; it can not be gainsaid, on the theory that the transaction was a purchase; that he was his agent during his absence in the army to erect the buildings. Before anything was expended on the property he must be chargeable with the notice of the facts within the knowledge of his agent making the expenditures 'for him. It was the duty of the agent to communicate to his principal the knowledge that he had of the prior equities, and the law will presume that he did. Notice to the agent on the premises doing the work must be regarded as notice to the principal who employed him. If the appellant, himself, had been making the improvements, the law would not permit the holders of the equities to stand by and see him expend his money under the belief that he would obtain the title under the deed. It would have been their plain duty to have given him notice of whatever rights they claimed. He was absent, and no personal notice could be given to him. It would have been idle to·have given notice to the agent who was having the work done, for he was, himself, the trustee, and in possession of all the facts.

The appellant, therefore, had constructive notice, at least, of the prior equities of the appellees, grantor, and of the parties holding the indebtedness secured by the Aiken deed of trust, before he invested anything in improvements or paid anything on what he terms the purchase money, that is, before he took up any of the interest notes secured by the Lay mortgage, and he can not be considered a *bona fide* purchaser for value without notice. Indeed, we think the transaction can not be deemed a purchase. The appellant, at sundry times, had intrusted Lay with funds to be by him safely and securely invested at a profitable rate of interest, and the conveyance

was simply an assignment of the title which Lay held as security for the moneys so advanced, the legal effect of which was to constitute the appellant a mortgagee in possession. That this is the true construction of the original arrangement between Lay and the appellant, we have no doubt. This view of the case is in harmony with what he said to Heald and Throop at their interview in the summer of 1864, that all he wanted was his money invested and the interest thereon ; and with the conversation in regard to the $30,000 to settle the whole matter. This theory affords the only satisfactory reason why the appellant took an assignment of the Lay notes and mortgages when he took them up, instead of having them cancelled, as he would have done if they had been, in fact, paid as a part of the consideration of the property. The acts of the parties can be reconciled on no other hypothesis.

It is said that neither Heald nor Throop had agreed to redeem the land, and that they were under no legal obligations to do so. It is immaterial whether they had agreed to do so or not. They had the legal right if they chose to exercise it. No mortgagor is under any legal obligation to redeem the mortgaged premises. It is his right, which he can elect to exercise or omit.

It is conceded that this property would constitute a fund in the hands of Lay or his assignee for the payment of the debt due to his father, but if he could not realize it out of the rents of the property the only remedy would have been to have foreclosed the equity of redemption of the parties interested. Lay was not, by any agreement or contract, invested with power to make a sale in his own name that would cut off the equity of redemption. He held the estate as trustee, and in no other right, and the conveyance to appellant, without the consent of Heald and the other parties, was a violation of the confidence reposed in him. The equity of redemption of Heald was never, in any lawful way, foreclosed or cut off.

The appellant having had constructive, if not actual, notice through his agent of the prior equities before he made any

improvements or paid anything on the contract, as he states it, can not be considered as having acquired the legal title to the property, discharged from the equities of the appellee, and the decree of the circuit court allowing a redemption is affirmed.

*Decree affirmed.*

Mr. JUSTICE WALKER: I do not concur in the conclusion arrived at by the majority of the court.